1

2

3

4

5

6

7                        UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF WASHINGTON
8                                  AT SEATTLE

9

10   CRAIG WIRELESS SYSTEMS LTD., a
     Canadian federal corporation; and CRAIG
11   WIRELESS MANITOBA INC., a Canadian
     federal corporation,                              C10-1269Z
12
                          Plaintiffs,                  ORDER
13
     v.
14
     CLEARWIRE LEGACY LLC, a Delaware
15   corporation; and FIXED WIRELESS
     HOLDINGS, LLC, a Delaware limited
16   liability company,

17                        Defendants.

18

19           THIS MATTER comes before the Court on defendants' motion for summary

20   judgment, docket no. 42, defendants' motions for partial summary judgment, docket nos. 43

21   and 44, plaintiffs' cross-motion for summary judgment, as amended, docket nos. 50 & 58,

22   and plaintiffs' cross-motion for partial summary judgment, docket no. 51.  Having reviewed

23   all papers filed in support of and in opposition to each motion, and having considered the oral

24   arguments of counsel, the Court enters the following Order.

25

26

ORDER  - 1

**Background**

Plaintiffs Craig Wireless Systems Ltd. ("Craig Wireless") and Craig Wireless Manitoba Inc. ("CW-Manitoba") allege four claims: (i) for breach of contract, namely the Equipment Lease Agreement; (ii) for breach of contract, namely the Stock Purchase Agreement; (iii) for breach of implied covenant of good faith and fair dealing; and (iv) for unjust enrichment or quantum meruit. First Amended Complaint (docket no. 28). Defendants Clearwire Legacy LLC ("Clearwire Legacy") and Fixed Wireless Holdings, LLC ("Fixed Holdings") allege five counterclaims, including a counterclaim for breach of contract. Second Amended Answer and Counterclaims (docket no. 30). The parties' dispute involves three agreements executed between September 2004 and June 2005, namely (i) the Stock Purchase Agreement, (ii) the Agreement Regarding Manitoba Operations ("ARMO"), and (iii) the Equipment Lease Agreement ("Lease Agreement").

**A.    Stock Purchase Agreement**

The following entities entered into the Stock Purchase Agreement, which is dated September 30, 2004: (i) Fixed Holdings; (ii) Craig Wireless; (iii) Craig Wireless Nevada Inc. ("CW-Nevada"); and (iv) Craig Wireless Honolulu Inc. ("CW-Honolulu"). *See* Stock Purchase Agreement, Ex. B to Beams Decl., Tab 3 to Defendants' Factual Record ("DFR") (docket no. 45-1 at 27-87). At the time, Craig Wireless owned all of the shares of CW-Nevada, and CW-Nevada owned all of the shares of CW-Honolulu.

Fixed Holdings is a subsidiary of Clearwire Legacy. Beams Decl. at ¶ 4, Tab 1 to DFR (docket no. 45-1 at 3). Clearwire Legacy is a subsidiary of Clearwire Corporation, which is a "leading provider of wireless broadband services in the United States." *Id.* at ¶ 3. Clearwire Legacy is the successor-in-interest to Clearwire Corporation, which no longer exists and which was a different entity from the current Clearwire Corporation. *Id.* Fixed Holdings and Clearwire Legacy are defendants in this action, but Clearwire Corporation is not a party.

1    To provide wireless broadband (*e.g.*, internet) services within the United States, an

2    entity must have a spectrum license from the Federal Communications Commission ("FCC")

3    or must lease such license.  Hopper Decl. at ¶ 3, Tab 14 to DFR (docket no. 45-2 at 3).  The

4    FCC issues wireless spectrum licenses in a geographic manner.  *Id.*  Prior to the transaction

5    memorialized in the Stock Purchase Agreement, CW-Honolulu held spectrum licenses for

6    and operated a wireless cable system on the Island of Oahu.

7    Pursuant to the Stock Purchase Agreement, Fixed Holdings purchased from

8    CW-Nevada all outstanding shares of the capital stock of CW-Honolulu for $10 million.

9    Stock Purchase Agreement at Recital B & §§ 2.1 & 2.2 (docket no. 45-1 at 31, 37).  Prior to

10   the closing date for the transaction, Fixed Holdings loaned $10 million to CW-Nevada, and

11   at the time of closing, the purchase price was paid by means of a credit against the

12   outstanding balance of the loan.  *Id.* at § 2.3 (docket no. 45-1 at 37).  Closing was contingent

13   on *inter alia* approval from the FCC and execution of "Investment Documents" related to a

14   joint venture "to develop wireless spectrum opportunities in Manitoba, Canada."  *Id.* at p. 4

15   (defining "Investment Documents" & "Joint Venture") & §§ 7.1 & 7.3(e) (docket no. 45-1 at

16   34, 52-54).

17   **B.      Agreement Regarding Manitoba Operations**

18   The ARMO was among the Investment Documents referenced in the Stock Purchase

19   Agreement.  The ARMO, dated September 30, 2004, was between the following entities:

20   (i) Craig Wireless; (ii) CW-Nevada; (iii) CW-Honolulu; and (iv) Clearwire Corporation,

21   predecessor of Clearwire Legacy.  *See* ARMO, Ex. G to Beams Decl., Tab 8 to DFR (docket

22   no. 45-1 at 102-27).  The ARMO envisioned that a new corporation ("Opco") would be

23   created, that 85% of Opco's shares would be owned by Manalta Investment Company Ltd.

24   ("Manalta"), and that 15% of Opco's shares would be owned by Clearwire Corporation, now

25   Clearwire Legacy.  *Id.* at § 1.1 (docket no. 45-1 at 102-03).  The consideration for the 15%

26   interest in Opco was execution of the Lease Agreement, an unexecuted copy of which is

1   attached as an exhibit to the ARMO, as well as a Roaming Agreement, which is further

2   defined in Article 2 of the ARMO.  *See id.* at § 1.1 & Ex. 2 (docket no. 45-1 at 102-03,

3   111-27).

4          The ARMO provides that, "[i]n the event that the Equipment . . . is not delivered to

5   Opco in accordance with the Equipment Lease Agreement, then Opco shall not be obliged to

6   issue shares to Clearwire Corporation [now Clearwire Legacy] or its affiliate, and may retract

7   such shares if already issued."  *Id.* at § 1.1 (docket no. 45-1 at 103).  The new corporation

8   contemplated by the ARMO (Opco), was initially named "6311458 Canada Ltd.," but it later

9   became CW-Manitoba, one of the plaintiffs in this action.

10  **C.      Equipment Lease Agreement**

11         Also among the Investment Documents contemplated in the Stock Purchase

12  Agreement was the Lease Agreement dated June 30, 2005, which was executed by the

13  following entities:  (i) Clearwire Corporation, predecessor of Clearwire Legacy ("Lessor");

14  and (ii) 6311458 Canada Ltd., predecessor of CW-Manitoba ("Lessee").  *See* Lease

15  Agreement, Ex. A to Beams Decl., Tab 2 to DFR (docket no. 45-1 at 8-25); *see also* Beams

16  Decl. at ¶ 5 (docket no. 45-1 at 3).  The Lease Agreement recites that

17         the Lessee has agreed to issue shares to the Lessor representing fifteen percent
           (15%) of its total outstanding shares of capital stock (the "Shares") in partial
18         consideration for the Lessor using commercially reasonable efforts to arrange
           for the execution of a roaming agreement . . . [and] the Lessor has agreed, in
19         partial consideration for the issue of the Shares, to enter into this Lease
           Agreement.
20
21  Lease Agreement, Introduction (docket no. 45-1 at 8); *see id.* at ¶ 9 ("The consideration for

    the Lease Agreement by Lessor is the issuance of the Shares.") (docket no. 45-1 at 14).
22
23         The Lease Agreement defines "Equipment" as:

24         NextNet Expedience Base Stations . . . together with all replacement parts,
           additions and accessories incorporated therein or affixed thereto including,
           without limitation, any software that is a component or integral part of, or is
25         included or used in connection with, any Item of Equipment, but with respect
           to such software, only to the extent of the Lessor's interest therein, if any.
26

ORDER  - 4

1   *Id.* at ¶ 4 (docket no. 45-1 at 11); *see id.* ("Item of Equipment" means "each item of the

2   Equipment" and "NextNet" means "NextNet Wireless, Inc.") (docket no. 45-1 at 11-12).

3   Expedience is only one type of base station.  *See* Hopper Decl. at ¶ 6 (docket no. 45-2 at 4-

4   5).  A base station contains hardware that facilitates wireless communication.  *Id.* at ¶ 4

5   (docket no. 45-2 at 3-4).  Expedience systems are manufactured by a single company (*i.e.*,

6   NextNet, at the time of the Lease Agreement), but competing and incompatible base stations

7   using WiMAX technology are provided by several different entities.  *Id.* at ¶ 6 (docket no.

8   45-2 at 4-5).

9           Under the Lease Agreement, the leased Equipment was to be delivered "from time to

10  time" as "needed" for "deployment in Manitoba."  Lease Agreement at ¶ 1(c) (docket

11  no. 45-1 at 9).  Lessee was contractually prohibited from using, or permitting the use of, the

12  Equipment "anywhere other than in Manitoba," provided that, upon the sale of Lessee or

13  substantially all of its assets, the Equipment could be used "outside of North America."  *Id.* at

14  ¶ 1(d); *see also id.* at ¶ 10 (docket no. 45-1 at 14) ("Except in connection with maintenance

15  and repair, the Equipment shall not [be] removed from the Permitted Territory.").  Moreover,

16  absent Lessor's prior written consent, Lessee could not "ASSIGN, TRANSFER, PLEDGE,

17  HYPOTHECATE OR OTHERWISE DISPOSE OF THIS LEASE, THE EQUIPMENT, OR ANY INTEREST

18  THEREIN," except to secure obligations to bona fide third party lenders.  *Id.* at ¶ 15(a) (docket

19  no. 45-1 at 16).

20          The term of the Equipment Lease Agreement was five years, with Lessor having a

21  right to renew for up to five additional one-year terms.  *Id.* at ¶ 8 (docket no. 45-1 at 14).

22  Lessor did not exercise this option, and the Equipment Lease Agreement expired on either

23  June 30 or July 1, 2010.  Upon the expiration of the Equipment Lease Agreement, Lessee had

24  the right to purchase the Equipment for $1.00, *id.*, but because no Equipment had been

25  delivered to Lessee, Lessee was unable to invoke this provision.

26

1   The Equipment subject to the Lease Agreement was to have a maximum aggregate

2   value of $5 million, adjusted for *inter alia* the interest on the loan made under the Stock

3   Purchase Agreement by Fixed Holdings to CW-Nevada.  *Id.* at ¶ 1(b) (docket no. 45-1 at

4   8-9).  The parties agree that the accrued interest on the $10 million loan was $450,000.

5   Amended Complaint at ¶ 13 (docket no. 28); Second Amended Answer and Counterclaims at

6   ¶ 13 (docket no. 30).  Thus, Lessor's obligation under the Lease Agreement was limited to

7   Equipment worth a total of $4.55 million.  Lessor's "wholesale" cost to provide Equipment

8   with an aggregate retail value of $4.55 million was only $2.5 million, which is the value the

9   parties ascribed to the 15% share of CW-Manitoba.  *See* Beams Decl. at ¶ 8 (docket no. 45-1

10   at 4-5).

11   The value of Equipment was to be determined "in good faith by Lessor, based on the

12   list prices at which such Equipment is sold to similarly situated purchasers of such

13   Equipment by NextNet."  Lease Agreement at ¶ 1(b) (docket no. 45-1 at 8-9).  The number

14   of NextNet Expedience Base Stations comprising the Equipment subject to lease was to be

15   determined "based on NextNet's list prices for the base stations in effect at the time of the

16   Equipment Order."  *Id.* at ¶ 4 (docket no. 45-1 at 11) (defining "Equipment").  The

17   Equipment was to be leased "as is," and Lessee was to bear all responsibility, at its own

18   expense, for keeping the Equipment in good repair, and all risks, if any, of defects in or

19   unfitness of the Equipment.  *Id.* at ¶¶ 2(b) & 12 (docket no. 45-1 at 9-10, 15).  Lessor,

20   however, was required to assign to Lessee, upon delivery of Equipment, the limited warranty

21   from the Supplier (NextNet or its successor), a sample of which is shown in Exhibit A to the

22   Lease Agreement.  *Id.* at ¶ 2(a) (docket no. 45-1 at 9).  The NextNet warranty guaranteed

23   repair or replacement of any component with a defect caused by "faulty materials and/or

24   workmanship," if such component was returned to NextNet within two (2) years from the

25   ship date.  *Id.* at Ex. A (docket no. 45-1 at 24-25).

26

ORDER - 6

1    **D.    <u>Performance or Breach</u>**

2          At the time the Lease Agreement was executed, Clearwire owned NextNet.  Beams

3    Decl. at ¶ 8 (docket no. 45-1 at 4-5).  Approximately a year later, NextNet was sold to

4    Motorola.[1]  <u>*Id.*</u>  Sometime after NextNet was acquired by Motorola, CW-Manitoba

5    transmitted an Equipment Order requesting <u>*inter alia*</u> eighty-five (85) Motorola WiMAX

6    base stations priced at $45,000 each.  Purchase Order No. 4252 (Dec. 6, 2007), Ex. B to

7    Hopper Decl., Tab 16 to DFR (docket no. 45-2 at 11); <u>*see also*</u> Lease Agreement at

8    ¶¶ 6(a)-(g) (docket no. 45-1 at 12-14) (regarding the method for ordering Equipment).  No

9    Motorola WiMAX base stations were delivered.  In the following year, CW-Manitoba issued

10   a replacement Equipment Order for various components of Expedience systems, rather than

11   the previously requested WiMAX base stations.  Purchase Order No. 4252 (Dec. 31, 2008),

12   Ex. D to Hopper Decl., Tab 18 to DFR (docket no. 45-2 at 16).  This Equipment Order was

13   revised three more times.  Purchase Order No. 4252 (Jan. 13, 2009), Ex. E to Hopper Decl.,

14   Tab 19 to DFR (docket no. 45-2 at 18); Purchase Order No. 4252 (Jan. 21, 2009), Ex. F to

15   Hopper Decl., Tab 20 to DFR (docket no. 45-2 at 20); Purchase Order No. 4252 (Mar. 16,

16   2009), Ex. G to Hopper Decl., Tab 21 to DFR (docket no. 45-2 at 22).  The final version of

17   the Equipment Order, dated March 16, 2009, requested <u>*inter alia*</u> eighteen (18) Expedience

18   base stations at a unit price of $1,800 and indicated that all equipment was "in refurbished

19   condition bearing 1 year warranty."  Tab 21 to DFR (docket no. 45-2 at 22); <u>*see also*</u> Ex. G

20   to T.B. Craig Decl. (docket no. 54-3) (e-mails regarding Purchase Order No. 4252).  Via e-

21   mail dated June 8, 2009, CW-Manitoba cancelled the Equipment Order.  Ex. H to Hopper

22   Decl., Tab 22 to DFR (docket no. 45-2 at 24).

23

24   _____

25   [1] Exactly which Clearwire entity owned NextNet, and exactly which Motorola entity purchased NextNet, remains unclear.  While this case has been pending, however, a company called Motorola Solutions came into existence and assumed the assets of NextNet.  *See* Clark Dep. at 9:23-12:24, Ex. J to Schachter Decl.

26   (docket nos. 53-1 & 59).  In April 2011, Motorola Solutions was acquired by Nokia Siemens Networks.  *Id.* at 9:23-24 & 10:21-12:1.

ORDER  - 7

On November 18, 2009, CW-Manitoba placed an Equipment Order for twenty-four (24) different items of varying quantities and unit prices, totaling a little more than $4.85 million.[2]  Ex. I to Hopper Decl., Tab 23 to DFR (docket no. 45-2 at 29).  Clearwire Legacy offered to fill the Equipment Order by supplying used or refurbished Expedience base stations.  T.B. Craig Decl. at ¶ 58 (docket no. 54 at 14).  Clearwire Legacy also proposed an equivalent value of Samsung WiMax base stations.  *Id.* at ¶ 60.  CW-Manitoba rejected both tenders, asserting that the proffered items were nonconforming goods.  *Id.* at ¶¶ 59 & 60.

On April 1, 2010, CW-Manitoba issued a notice that a special meeting of shareholders would occur on April 26, 2010, at which approval would be sought for the sale of its spectrum licenses to Inukshuk Wireless Partnership ("Inukshuk").  Ex. J to T.B. Craig Decl. (docket no. 54-4 at 5-6).  The gross income from the sale, which closed in August 2010, was $24.8 million.  *Id.*; *see also* Ex. L to T.B. Craig Decl. (docket no. 54-4 at 22).  The parties have stipulated that Clearwire Legacy's 15% share of the net proceeds is not less than $2,557,303.25 (in Canadian funds).  *See* Ex. P to Clark Decl., Tab 44 to DFR (docket no. 62 at 38-39); *compare* Ex. J to T.B. Craig Decl. (docket no. 54-4 at 4) (calculating the net pro rata amount as $2,629,638).

On the date the transaction with Inukshuk closed, August 6, 2010, CW-Manitoba transmitted to Clearwire Legacy a notice of share retraction.  Exs. K & L to T.B. Craig Decl. (docket no. 54-4 at 19-20, 22).  The notice indicated that, "pursuant to the failure of

---

[2] According to Scott Hopper, former Senior Vice President of Corporate Development and current consultant for Clearwire Corporation, the final Equipment Order requests items other than the NextNet Expedience base stations contemplated in the Lease Agreement. Hopper Decl. at ¶¶ 2 & 8 (docket no. 45-2 at 2-3, 5).  The final Equipment Order is divided into three sections:  (1) wireless base station components (totaling $2,801,440); (2) data processing and authentication (valued at $718,300); and (3) customer premises equipment ("CPE") (equaling $1,332,500).  Tab 23 to DFR (docket no. 45-2 at 29).  Defendants contend that plaintiffs have conceded that CPE does not constitute Equipment under the Lease Agreement, citing Thomas Boyd Craig's deposition (Tab 36 to DFR at 125:20-126:5, docket no. 45-3 at 94-95), and they indicate that whether data processing and authentication items qualify as Equipment is an issue to be settled by further motion or at trial.  In light of the Court's ruling that retraction of shares is the exclusive remedy for any breach of the Lease Agreement, the Court need not and does not address whether plaintiffs' damages would be limited to the value of non-CPE items listed in the Equipment Order dated November 18, 2009.

Clearwire Corporation ('Clearwire') to deliver Equipment . . . to the undersigned in accordance with the terms of the Equipment Lease Agreement, pursuant to Section 1.1 of the Agreement Regarding Manitoba Operations . . . and applicable law, the 150 Class A common shares . . . issued to and held by Clearwire in the capital of the undersigned have been retracted and cancelled."  Ex. K to T.B. Craig Decl.  No portion of the proceeds from the sale of spectrum licenses to Inukshuk was paid to Clearwire Legacy.

**E.      Pending Motions**

With respect to the pending motions, plaintiffs take the position that the "real" transaction was a $15-million sale of CW-Honolulu, with $10 million paid in cash and $5 million paid in Equipment as defined in the Lease Agreement.  Defendants counter that the transaction at issue had two separate parts, one effecting a $10-million sale of CW-Honolulu, and the other involving a joint venture whereby shares were exchanged for leased Equipment of comparable wholesale value.  With their divergent views in mind, the parties have categorized their motions into three groups, namely (i) the merits of the various claims and counterclaims, (ii) limitations on damages, and (iii) lack of standing.  The Court concludes that a different sequence of analysis will more efficiently resolve the matter.  The Court will first address whether a breach of the Lease Agreement was a condition precedent to any retraction of shares under the ARMO, and will then turn to the question of whether retraction of shares was the exclusive remedy for any breach of the Lease Agreement.  As acknowledged by counsel during oral argument, the Court's rulings on these issues render most of the parties' remaining arguments moot.

**Discussion**

**A.      Summary Judgment Standard**

The Court shall grant summary judgment if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (2010).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of

1   material fact.  _Celotex Corp. v. Catrett_, 477 U.S. 317, 323 (1986).  A fact is material if it

2   might affect the outcome of the suit under the governing law.  _Anderson v. Liberty Lobby,_

3   _Inc._, 477 U.S. 242, 248 (1986).  In support of its motion for summary judgment, the moving

4   party need not negate the opponent's claim, _Celotex_, 477 U.S. at 323; rather, the moving

5   party will be entitled to judgment if the evidence is not sufficient for a jury to return a verdict

6   in favor of the opponent, _Anderson_, 477 U.S. at 249.  To survive a motion for summary

7   judgment, the adverse party must present affirmative evidence, which "is to be believed" and

8   from which all "justifiable inferences" are to be favorably drawn.  _Id._ at 255, 257.  When the

9   record taken as a whole, could not lead a rational trier of fact to find for the non-moving

10  party, summary judgment is warranted.  _See, e.g._, _Beard v. Banks_, 548 U.S. 521, 529 (2006).

11  **B.**     **Contract Interpretation under Washington Law**

12          The Stock Purchase Agreement, the ARMO, and the Lease Agreement all contain a

13  choice of law provision indicating that the contract will be governed by and construed in

14  accordance with Washington law.  _See_ Stock Purchase Agreement at § 10.6 (docket no. 45-1

15  at 61); ARMO at § 4.6 (docket no. 45-1 at 106); Lease Agreement at ¶ 28 (docket no. 45-1

16  at 22); _see also_ Restatement (Second) of Conflict of Laws § 187(1) (1971) ("The law of the

17  state chosen by the parties to govern their contractual rights and duties will be applied if the

18  particular issue is one which the parties could have resolved by an explicit provision in their

19  agreement directed to that issue.").

20          Washington courts follow the "objective manifestation" theory of contracts.  _Hearst_

21  _Commc'ns, Inc. v. Seattle Times Co._, 154 Wn.2d 493, 503, 115 P.3d 262 (2005).  Under this

22  approach, the focus is on "the objective manifestations of the agreement, rather than on the

23  unexpressed subjective intent of the parties."  _Id._  Words in a contract are assigned their

24  reasonable, "ordinary, usual, and popular" meaning unless the agreement "clearly

25  demonstrates a contrary intent."  _Id._ at 503-04.  If the parties' intent can be divined from the

26  actual words within the four corners of the document, extrinsic evidence will not be

ORDER  - 10

1   considered.  *See* *id.* at 503-04.  If the Court must resort to extrinsic evidence to interpret the

2   agreement, it may do so only to determine the meaning of specific words and terms used in

3   the contract, and not to infer an intent "independent of the instrument" or to "vary,

4   contradict, or modify" what was written.  *Id.* at 503; *see also* *id.* at 504 (Washington courts

5   "do not interpret what was intended to be written but what was written" (clarifying the

6   holding of *Berg v. Hudesman*, 115 Wn.2d 657, 801 P.2d 222 (1990))).  Extrinsic evidence

7   may consist of testimony concerning the events surrounding the formation of the contract, as

8   well as the subsequent conduct of the parties.  *Id.* at 502 (citing *Berg*, 115 Wn.2d at 667-68).

9   **C.**      **Interpretation of Retraction Clause**

10      Plaintiffs contend that, under the retraction clause of the ARMO, CW-Manitoba had

11  the unconditional right to retract Clearwire Legacy's shares.  Defendants counter that

12  CW-Manitoba was entitled to retract the shares only if Clearwire Legacy breached the Lease

13  Agreement.  The dispute centers on the meaning of the phrase "in accordance with the

14  Equipment Lease Agreement," which appears in the following provision of the ARMO:

15          In the event that the Equipment . . . is not delivered to Opco in
            accordance with the Equipment Lease Agreement, then Opco shall not be
16          obliged to issue shares to Clearwire Corporation [now Clearwire Legacy] or its
            affiliate, and may retract such shares if already issued.

17
18  ARMO at § 1.1 (docket no. 45-1 at 103).  Plaintiffs propose to ignore the language, while

19  defendants characterize it as ambiguous and suggest that the Court must look to extrinsic

20  evidence to understand it.

21      In interpreting a contract, the Court must give effect to every term "so as not to render

    any word superfluous."  *E.g.*, *Rimov v. Schultz*, 162 Wn. App. 274, 282, 253 P.3d 462
22
    (2011).  Because plaintiffs' position would nullify the "in accordance" clause, the Court
23
    rejects the idea that CW-Manitoba could retract the shares simply because Equipment was
24
    not delivered.  The Court also disagrees with defendants' contention that the language is
25
    ambiguous.  Under the Lease Agreement, before Equipment can be delivered, it must first be
26
    ordered.  *See* Lease Agreement at ¶¶ 6(a)-(g) (docket no. 45-1 at 12-14).  Thus, the phrase

ORDER  - 11

1   "Equipment . . . not delivered . . . in accordance with" the Lease Agreement means

2   Equipment ordered by Lessee in the manner set forth in the contract that was not delivered

3   by the means described therein.  As so interpreted, this provision requires more than mere

4   non-delivery of Equipment, but less than breach of the Lease Agreement.

5          This reading of the ARMO is consistent with the extrinsic evidence concerning the

6   parties' negotiations.  Three days before the ARMO was executed, counsel for plaintiff Craig

7   Wireless sent an e-mail to counsel for defendant Clearwire Legacy requesting that the Lease

8   Agreement be modified to reflect that "IF CLEARWIRE BREACHES UNDER THE LEASE (I.E. DOES

9   NOT DELIVER THE EQUIPMENT) . . . WE SHOULD BE ABLE TO TREAT IT AS A BREACH UNDER THE

10  SUBSCRIPTION AGREEMENT AND THE SHAREHOLDERS AGREEMENT AND POSSIBLY REACQUIRE

11  THE SHARES WHICH HAVE BEEN ISSUED TO CLEARWIRE."  E-mail from Michael Guttormson to

12  Broady Hodder dated September 27, 2004, Ex. I to Beams Decl., Tab 10 to DFR (docket

13  no. 45-1 at 148) (referring to Lease Agreement at ¶ 20, titled "Events of Default;

14  Remedies").  Clearwire Legacy's attorney responded with a proposal "to address

15  [Mr. Guttormson's] comment regarding Section 20 [of the Lease Agreement] in the joint

16  venture investment documents."  E-mail from Broady Hodder to Michael Guttormson dated

17  September 28, 2004, Ex. N to Beams Decl., Tab 42 to DFR (docket no. 62 at 31).

18  Mr. Hodder indicated Clearwire Legacy's willingness "to include a cross-default type

19  provision in the investment documents which would allow the joint venture to take back its

20  shares for any breach as one possible remedy."  *Id.*

21         In response, Craig Wireless's attorney proposed the following language: "In the event

22  that the equipment . . . is not delivered to Opco, then Opco shall not be obliged to issue

23  shares to Clearwire Corporation or its affiliate, and may retract such shares if already

24  issued."  E-mail from Doug Sigurdson dated September 28, 2004, 10:51 a.m., Ex. J to Beams

25  Decl., Tab 11 to DFR (docket no. 45-1 at 152).  Craig Wireless's attorney requested that this

26  wording be added to the end of Section 1.1 of the ARMO, but indicated that opposing

1  counsel should "feel free to amend" the sentence. _Id._ Clearwire Legacy's counsel revised

2  the ARMO along these lines, but added, after the phrase "not delivered to Opco," the clause

3  "in accordance with the Equipment Lease Agreement."  E-mail from Jay Hull dated

4  September 28, 2004, Ex. J to Beams Decl., Tab 11 to DFR (docket no. 45-1 at 151).  Craig

5  Wireless's attorney agreed to this change.  _See_ E-mail from Doug Sigurdson dated September

6  28, 2004, 1:38 p.m., Ex. J to Beams Decl., Tab 11 to DFR (docket no. 45-1 at 151) ("that is

7  perfect").

8         This sequence of correspondence is consistent with the Court's understanding that the

9  phrase "in accordance with the Equipment Lease Agreement" has some meaning and cannot

10  be entirely ignored.  Craig Wireless expressed a desire for retraction of shares to be a remedy

11  in the event Equipment was not delivered.  Clearwire Legacy agreed to a "cross-default type

12  provision," but suggested that it be placed in the ARMO, as opposed to the Lease Agreement

13  itself.  Craig Wireless's attorney proposed language that provided an unconditional right to

14  retract shares, but Clearwire Legacy's counsel countered with the "in accordance" clause.

15  Having accepted this phrasing, Craig Wireless assented to something more than mere non-

16  delivery of Equipment as a prerequisite to the retraction of shares.  Likewise, having offered

17  "in accordance" language, rather than more explicit terminology like "breach" or "default,"

18  Clearwire Legacy has no basis for arguing that its shares could be forfeited only upon a

19  breach of the Lease Agreement.

20         In light of the Court's ruling, plaintiffs are entitled to summary judgment as to all of

21  defendants' counterclaims.  CW-Manitoba undisputedly requested Equipment in the manner

22  outlined in the Lease Agreement[3] and such Equipment was never delivered.  Whether the

23  non-delivery constituted a breach of the Lease Agreement is irrelevant for purposes of

24  _____

25  [3] Although defendants contend that some of the items listed in the Equipment Order dated November 18, 2009, were not within the contemplation of the Lease Agreement, they do not advance the position that the Expedience components requested therein did not qualify as Equipment as defined by the Lease Agreement

26  or that the way in which such Expedience systems were ordered failed to comport with the procedures outlined in the parties' contract.

1    Section 1.1 of the ARMO, and CW-Manitoba was entitled to retract the shares at issue.

2    The Court therefore DISMISSES with prejudice all five of defendants' counterclaims.[4]

3    **D.    Retraction Is Exclusive Remedy**

4        CW-Manitoba having already retracted Clearwire Legacy's shares, the question

5    remains whether CW-Manitoba would be entitled to any other or additional remedy if it

6    established that Clearwire Legacy breached the Lease Agreement.  Defendants contend that

7    retraction is the exclusive remedy, while plaintiffs argue that they should be allowed to

8    pursue the maximum amount stated in the Lease Agreement, *i.e.*, $4.55 million.[5]

9        Plaintiffs' position rests on the faulty premise that the "real" deal was a sale of

10   CW-Honolulu for $15 million, and that, because they never got any Equipment, they did not

11   receive the full purchase price.  The Stock Purchase Agreement, which explicitly recites a

12   purchase price of $10 million, belies plaintiffs' assertion.  Stock Purchase Agreement at § 2.2

13   (docket no. 45-1 at 37).  Plaintiffs cannot use extrinsic evidence to contradict this provision

14   of the Stock Purchase Agreement.  *Hearst*, 154 Wn.2d at 503.  Moreover, Clearwire Legacy,

15   the only defendant against whom the claim for breach of the Lease Agreement is asserted,

16   was not a party to the Stock Purchase Agreement,[6] and Fixed Holdings, the purchaser of

17   _____

18   [4] During oral argument, counsel for defendants clarified that defendants are not pursuing a claim that
     CW-Manitoba failed to follow the proper protocol in retracting Clearwire Legacy's shares, and that
19   defendants' counterclaims would rise or fall on the issue of whether CW-Manitoba had a right to retract the
     shares absent a breach of the Lease Agreement.

20   [5] Even if CW-Manitoba were permitted to recover damages in addition to the retraction of Clearwire
     Legacy's shares, such damages would be reduced by the value of the retracted shares.  Retraction was a
21   remedy for non-delivery of Equipment.  *See* ARMO at § 1.1 (docket no. 45-1 at 103).  Absent a setoff,
     damages for non-delivery in breach of the Lease Agreement would constitute double recovery.  Thus, having
22   conceded that they cannot prove any incidental or consequential damages, *see* Plaintiffs' Second Cross-
     Motion at 2:10-12 (docket no. 51), the most plaintiffs could obtain, were they to prevail on their claims,
23   would be under $1.99 million.

24   [6] Plaintiffs have identified sections of the Stock Purchase Agreement that they assert were violated by the
     alleged breach of the Lease Agreement.  As indicated by defendants, these highlighted provisions, namely
25   Sections 5.1, 5.2, 9.3, and 10.1, do not "come close to showing" that breach of the Lease Agreement was a
     violation of the Stock Purchase Agreement.  The provisions referenced by plaintiffs consist of warranties
26   concerning the authority to execute documents, indemnification language, and an integration clause.
     Plaintiffs point to no term in the Stock Purchase Agreement that defines breach as failing to deliver

ORDER  - 14

CW-Honolulu, was not a party to the Lease Agreement.  Finally, the Lease Agreement, which was not contemporaneously executed, but rather bears a date nine months later than the Stock Purchase Agreement, is not an exhibit to the Stock Purchase Agreement, and the Stock Purchase Agreement does not mention the Lease Agreement as part of the consideration, as opposed to a condition precedent,[7] for the purchase of CW-Honolulu.  _See_ Stock Purchase Agreement at §§ 7.2 & 7.3 (docket no. 45-1 at 53-54).  Thus, plaintiffs' "real" deal theory is rejected as a matter of law.[8]

Instead, the contracts reflect a two-part transaction, in which CW-Honolulu was sold for $10 million,[9] and shares in CW-Manitoba were issued in exchange for Equipment to be leased for five years and then purchased for $1.  The latter portion of the business arrangement was memorialized in the ARMO and the Lease Agreement, which the parties agree must be interpreted together.[10]  When read together, the Lease Agreement and the

---

Equipment under the Lease Agreement, which is not surprising given that Clearwire Legacy is not a party to the Stock Purchase Agreement.

[7] Notably, the sole condition precedent runs in favor of defendant Fixed Holdings, not plaintiffs.  One of the prerequisites to the obligation of Fixed Holdings to consummate the purchase of CW-Honolulu was the execution of the Investment Documents, including the Lease Agreement.  Stock Purchase Agreement at § 7.3(e) (docket no. 45-1 at 54).  No similar requirement is enumerated among the conditions precedent to the seller's (CW-Nevada's) performance.  _Id._ at § 7.2 (docket no. 45-1 at 53).

[8] For this reason, plaintiff Craig Wireless, which was not a party to the Lease Agreement, cannot assert a claim for breach of such contract.  Plaintiffs' assertion that Craig Wireless was a third-party beneficiary to the Lease Agreement rests solely on their mischaracterization of the "real" transaction as a $15-million sale of CW-Honolulu.  Thus, the Court GRANTS defendants' motion for partial summary judgment as to Craig Wireless's lack of standing to assert a claim for breach of the Lease Agreement; Craig Wireless is not a proper plaintiff.

[9] Plaintiffs make no contention that the $10 million owed under the Stock Purchase Agreement was not paid, and they base their claim for breach of the Stock Purchase Agreement entirely on non-delivery of Equipment pursuant to the Lease Agreement.  Having concluded that the purchase of CW-Honolulu and the exchange of shares for leased Equipment were related but separate deals, and that plaintiffs have failed to identify any provision of the Stock Purchase Agreement supporting their claim of breach, the Court GRANTS defendants' motion for summary judgment as to plaintiffs' second cause of action and DISMISSES with prejudice plaintiffs' claim for breach of the Stock Purchase Agreement.

[10] Both contracts indicate that the shares issued pursuant to the ARMO are consideration for the Lease Agreement, and an unexecuted copy of the Lease Agreement is attached to the ARMO.  ARMO at § 1.1 & Ex. 2 (docket no. 45-1 at 102 & 111-27); Lease Agreement at Intro. & ¶ 9 (docket no. 45-1 at 8, 14).  The

ORDER  - 15

1   ARMO limit CW-Manitoba's remedy to retraction of Clearwire Legacy's shares.  The Lease

2   Agreement eliminates all remedies for CW-Manitoba,[11] but the ARMO indicates that if

3   Equipment is not delivered "in accordance with the Equipment Lease Agreement, then

4   [CW-Manitoba] shall not be obliged to issue shares to Clearwire [Legacy] or its affiliate, and

5   may retract such shares if already issued."  ARMO at § 1.1 (docket no. 45-1 at 103).  Thus,

6   the sole remedy for non-delivery of the Equipment requested under the Lease Agreement is

7   retraction of Clearwire Legacy's shares.

8        Plaintiffs attempt to avoid the waiver set forth in Paragraph 26(a) of the Lease

9   Agreement by arguing that the transaction at issue was a sale, not a lease, and that it was

10  therefore was governed by Article 2, rather than Article 2A, of the Uniform Commercial

11  Code ("UCC").  Plaintiffs' contention ignores Paragraph 2(b) of the Lease Agreement, which

12  also contains a limitation on remedies, but does not rely on any citations to the UCC.  Thus,

13  even if the parties effectively negotiated a sale, CW-Manitoba agreed to forego "ANY LOSS,

14  COST OR DAMAGE" associated with "FAILURE OF DELIVERY."  Lease Agreement at ¶ 2(b) (docket

15  no. 45-1 at 9-10).  Moreover, plaintiffs' suggestion that the transaction was a sale, not a

16  lease, runs contrary to the express provisions of the Lease Agreement.  *See* Lease Agreement

17  at ¶ 1(a) (docket no. 45-1 at 8) ("Lessor hereby leases to Lessee, and Lessee hereby leases

18  from Lessor, the Equipment, subject to and upon the terms set forth herein."); *id.* at ¶ 13

19  (docket no. 45-1 at 15) ("Upon the expiration or earlier termination of this Lease Agreement,

20  Lessee, at its sole expense, shall assemble and return the Equipment to Lessor by delivering

21  _____

22  ARMO and the Lease Agreement are inextricably linked; the parties could not have entered into one
     without executing the other.

23  [11]*See* Lease Agreement at ¶ 2(b) (docket no. 45-1 at 9-10) ("EXCEPT FOR THE REPRESENTATIONS,
24  WARRANTIES AND COVENANTS OF THE LESSOR EXPRESSLY SET FORTH HEREIN, IN NO EVENT SHALL LESSOR BE
     LIABLE FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES (WHETHER UNDER THE UCC OR
25  OTHERWISE), INCLUDING, WITHOUT LIMITATION, ANY LOSS, COST OR DAMAGE TO LESSEE OR OTHERS ARISING
     FROM ANY OF THE FOREGOING MATTERS, INCLUDING, WITHOUT LIMITATION, DEFECTS, NEGLIGENCE, DELAYS,
26  FAILURE OF DELIVERY OR NON-PERFORMANCE OF THE EQUIPMENT."); *see also id.* at ¶ 26(a) (docket 45-1
     at 21) (Lessee "WAIVES ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON A LESSEE BY SECTIONS
     2A-508 THROUGH 2A-522 OF THE UNIFORM COMMERCIAL CODE.").

ORDER  - 16

1   such Equipment to a location in the Permitted Territory specified by Lessor."); *id.* at ¶ 15(a)

2   (docket no. 45-1 at 16) ("EXCEPT AS SET FORTH BELOW, WITHOUT LESSOR'S PRIOR WRITTEN

3   CONSENT, LESSEE SHALL NOT . . . ASSIGN, TRANSFER, PLEDGE, HYPOTHECATE OR OTHERWISE

4   DISPOSE OF THIS LEASE, THE EQUIPMENT OR ANY INTEREST THEREIN . . . .").

5           The ability of CW-Manitoba to later purchase the leased Equipment did not render the

6   transaction a sale. *See id.* at ¶ 8 (docket no. 45-1 at 14) ("Upon expiration of the Term, . . .

7   Lessee shall have the right to purchase the Equipment for a purchase price of $1.00 . . . .").

8   For the five-year duration of the Lease Agreement, Clearwire Legacy would continue to own

9   all Equipment and could demand its return upon CW-Manitoba's violation of the contract by,

10  for example, using the Equipment outside the Permitted Territory or failing to keep the

11  Equipment in good repair. *See id.* at ¶ 20(b) (docket no. 45-1 at 17-18) ("Upon the

12  occurrence of an Event of Default, Lessor may do one or more of the following as Lessor in

13  its sole discretion shall elect: . . . (5) demand that Lessee . . . return all Items of Equipment to

14  Lessor . . . ."); *see also id.* at ¶ 1(d) (docket no. 45-1 at 9) ("Lessee shall not use, or permit

15  the use, of the Equipment anywhere other than in Manitoba"); *id.* at ¶ 12 (docket no. 45-1 at

16  15) ("Lessee . . . shall keep the Equipment in good repair").  The transaction at issue fits well

17  within the definition of a lease, and does not qualify as a sale. *See* RCW 62A.2A-103(1)(j)

18  (lease means "a transfer of the right to possession and use of goods for a term in return for

19  consideration"); *compare* RCW 62A.2-106(1) (a sale "consists in the passing of title from the

20  seller to the buyer for a price").

21          Having concluded that the parties' agreements limit CW-Manitoba's remedy to the

22  retraction of shares, the Court must address whether this limitation is unconscionable.

23  Whether a limitation on remedies is unconscionable constitutes a question of law. *Torgerson*

24  *v. One Lincoln Tower, LLC*, 166 Wn.2d 510, 517, 210 P.3d 318 (2009).  In commercial

25  transactions, provisions excluding remedies are prima facie conscionable and enforceable,

26  and the party attacking a clause bears the burden of showing that it is unconscionable. *Cox v.*

ORDER - 17

1    _Lewiston Grain Growers, Inc._, 86 Wn. App. 357, 368, 936 P.2d 1191 (1997).  Washington

2    courts review exclusionary clauses for both procedural and substantive unconscionability.

3    _Torgerson_, 116 Wn.2d at 518-19; _see also_ _M.A. Mortenson Co. v. Timberline Software_

4    _Corp._, 140 Wn.2d 568, 585-89, 998 P.2d 305 (2000).

5           Procedural unconscionability is determined in light of the totality of the surrounding

6    circumstances, including the manner in which the parties entered into the contract, whether

7    the parties had a reasonable opportunity to understand the terms of the contract, and whether

8    the important terms were hidden in a maze of fine print.  _Torgerson_, 116 Wn.2d at 518-19;

9    _see also_ _Am. Nursery Prods., Inc. v. Indian Wells Orchards_, 115 Wn.2d 217, 222, 797 P.2d

10   477 (1990).  Substantive unconscionability exists when the contractual provision is "one-

11   sided," "shocking to the conscience," "monstrously harsh," or "exceedingly calloused."

12   _Torgerson_, 116 Wn.2d at 519; _see_ _M.A. Mortenson_, 140 Wn.2d at 586.  Such alleged

13   unfairness, however, "must truly stand out."  _Torgerson_, 116 Wn.2d at 519.

14          In this case, CW-Manitoba does not assert that the exclusionary claim is procedurally

15   unconscionable.  The Lease Agreement and ARMO are products of extended negotiations

16   between sophisticated business entities represented by counsel.  CW-Manitoba argues only

17   that the limitation to retraction of shares as a remedy is substantively unconscionable.  The

18   Court rejects this argument.  CW-Manitoba has not offered any evidence to dispute that, at

19   the time the Lease Agreement was executed, Clearwire Legacy's estimated "wholesale" cost

20   to provide Equipment with an aggregate retail value of $4.55 million was only $2.5 million.

21   _See_ Beams Decl. at ¶ 8 (docket no. 45-1 at 4-5).  Thus, Clearwire Legacy's 15% interest in

22   CW-Manitoba had an initial value of $2.5 million, and by retracting the shares, then

23   undisputedly worth $2.56 million, CW-Manitoba was effectively restored to its original

24   position.  Limiting CW-Manitoba's remedy to retraction of Clearwire Legacy's shares is not

25   unconscionable.

26

ORDER - 18

1    Even when conscionable, an exclusionary clause may be unenforceable if the limited

2  or exclusive remedy fails of its essential purpose.  *See* RCW 62A.2A-503(2); *see also Am.*

3  *Nursery*, 115 Wn.2d at 228; *Cox*, 86 Wn. App. at 370.  A limited or exclusive remedy fails of

4  its essential purpose if it deprives a party of the substantive value of its bargain.  *Cox*, 86 Wn.

5  App. at 370.  For example, in *Cox*, the limited remedy of a refund failed of its essential

6  purpose when, due to a latent defect, the seeds purchased did not produce an adequate crop;

7  because the plaintiff could not have discovered the problem until after planting the seeds and

8  waiting some period of time, a refund of the purchase price did not offer a sufficient remedy.

9  *Id.*; *see also Marr Enters., Inc. v. Lewis Refrigeration Co.*, 556 F.2d 951, 955 (9th Cir. 1977)

10 (indicating that a remedy can be inadequate "when the seller or other party required to

11 provide the remedy, by inaction or its action, causes the remedy to fail," as when a seller fails

12 "to replace or repair in a reasonably prompt and non-negligent manner").

13    The retraction of shares as an exclusive remedy does not fail of its essential purpose.

14 By retracting Clearwire Legacy's shares ($2.56 million), CW-Manitoba recouped more than

15 half of the unexpended credit under the Lease Agreement ($4.55 million), almost all of the

16 value of the base station components requested in the Equipment Order at issue

17 ($2.8 million), and more than the initial worth of the shares ($2.5 million).[12]  To the extent

18 that non-delivery of Equipment forced CW-Manitoba to sell its spectrum licenses or

19 precipitated a lower purchase price for them, thereby affecting the adequacy of share

20 retraction as a remedy, then CW-Manitoba, as the party challenging the exclusionary clause,

21 had the burden to make such showing.  CW-Manitoba has not provided a basis for deeming

22

23

24 [12] Plaintiffs do not contest any of these figures.  They have stipulated to the value of the retracted shares and
   to the balance due under the Lease Agreement.  They do not dispute the prices for the Expedience
25 components listed in the order placed in November 2009, and they have provided no evidence to refute the
   wholesale cost of Equipment with an aggregate retail value of $4.55 million, which was used to calculate the
26 initial worth of 15% of CW-Manitoba's shares.  Thus, plaintiffs cannot credibly contend that the retraction
   of shares was an insufficient remedy.

ORDER  - 19

1   the remedy limitation unenforceable, and thus, the Court GRANTS defendants' motion for

2   partial summary judgment and HOLDS that retraction of Clearwire Legacy's shares is

3   CW-Manitoba's exclusive remedy.  Having reached this conclusion, the Court concludes that

4   plaintiffs' first and third causes of action are moot and DISMISSES with prejudice plaintiffs'

5   claims for breach of the Lease Agreement and breach of the duties of good faith and fair

6   dealing.[13]

7   **E.      Unjust Enrichment or Quantum Meruit**

8          The Court's ruling concerning CW-Manitoba's limited contractual remedy does not

9   resolve whether plaintiffs may pursue a separate claim for unjust enrichment or quantum

10  meruit.  Defendants have moved to dismiss this claim because the matters at issue were

11  subject to written contracts.  Defendants' motion has merit.

12         A claim for unjust enrichment is based on the doctrine of implied contract.

13  _MacDonald v. Hayner_, 43 Wn. App. 81, 85, 715 P.2d 519 (1986).  A contract may be

14  implied either in fact or in law.  A contract implied in fact is based on the parties' conduct

15

_____

16  [13] Even if the Court were to reach the opposite result concerning the limitation on plaintiffs' remedy for
17  breach of the Lease Agreement, the Court would not decide the pending cross-motions for summary
    judgment in favor of plaintiffs.  Although plaintiffs point to various provisions of the Lease Agreement for
18  the proposition that Clearwire Legacy breached by tendering refurbished rather than new Equipment, they do
    not dispute that the contract is silent on the subject or that the parties never expressly negotiated about the
19  matter.  Moreover, during the latter part of the five-year term of the Lease Agreement, CW-Manitoba
    transmitted an explicit request for refurbished base stations, arguably acknowledging that used Equipment
20  was conforming under the Lease Agreement.  Plaintiffs proffer as an explanation that the employee who
    placed the Equipment Order was unaware of the terms of the Lease Agreement.  _See_ T.B. Craig Decl. at
21  ¶¶ 46-49 (docket no. 54 at 11-12).  This extrinsic evidence concerning the parties' course of dealing raises
    factual issues that preclude summary judgment.  The Court is likewise unpersuaded by defendants' asserted
22  excuse for nonperformance under the Lease Agreement.  The UCC envisions that anticipatory repudiation
    may be communicated by one contracting party to the other party, which may then take appropriate actions.
23  _See_ RCW 62A.2A-402.  Defendants, however, base their motion for summary judgment on the theory that
    anticipatory repudiation may be inferred from a later discovered intent to breach.  Defendants cite no
24  authority in which an unannounced subjective intent to repudiate, as opposed to actions or conduct
    manifesting such intent, was successfully interposed as a defense to a breach of contract claim.  Moreover,
25  even if defendants' legal theory were viable, they have failed to demonstrate an absence of factual dispute as
    to whether plaintiffs' purpose in attempting to procure the Expedience base stations at issue was to
26  improperly trade them to Motorola for WiMax systems.  Thus, if plaintiffs could pursue a remedy other than
    retraction of Clearwire Legacy's shares, their claim for breach of the Lease Agreement could not be resolved
    by the Court short of trial.

ORDER  - 20

1    rather than their expressions of assent, while a contract implied in law (a quasi contract)

2    arises from an implied duty of the parties, which does not rest on consent or agreement, but

3    rather on the prevention of unjust enrichment.  *Id.*  A party to a valid express contract,

4    however, may not simply disregard such agreement and bring an action on a theory of

5    implied contract relating to the same matter governed by the contract.  *Id.* at 85-86 (citing

6    *Chandler v. Wash. Toll Bridge Auth.*, 17 Wn.2d 591, 604, 137 P.2d 97 (1943)); *see also*

7    *United States ex rel. Walton Techn., Inc. v. Weststar Eng'g, Inc.*, 290 F.3d 1199, 1204 (9th

8    Cir. 2002) (applying Washington law).  Plaintiffs do not dispute that Washington courts

9    preclude unjust enrichment claims premised on transactions concerning which the parties

10   entered into express contracts.[14]

11          In contrast to a claim for unjust enrichment, a claim for quantum meruit arises in the

12   context of an express contract.  Quantum meruit is a remedy available when "substantial

13   change not within contemplation of the contracting parties occurs with a resulting benefit to

14   one party and expense to the other."  *MacDonald*, 43 Wn. App. at 84-85 (citing *Heaton v.*

15   *Imus*, 93 Wn.2d 249, 254, 608 P.2d 631 (1980)).  With respect to their claim for quantum

16   meruit, plaintiffs have not identified any unanticipated substantial change that led to the

17   damages being sought.  The sale of NextNet to Motorola was not unforeseeable, and the

18   parties provided for such change in defining the term "Supplier."  Lease Agreement at ¶ 4

19   (docket no. 45-1 at 12).  The non-delivery of Equipment was likewise considered when the

20   parties negotiated the contracts at issue, as evidenced by the provision in the ARMO

21   allowing CW-Manitoba to retract Clearwire Legacy's shares.  Although the tender of used or

22   refurbished as opposed to new Equipment was apparently not envisioned, plaintiffs do not

23   explain how a dispute over whether certain goods are conforming constitutes a "substantial

24   change" within the meaning of the quantum meruit doctrine.  Plaintiffs must be held to their

25   _____

26   [14] Plaintiffs' discussion of the issue indicates merely that the Court has discretion to craft appropriate
     remedies and recites the elements of unjust enrichment.  *See* Plaintiffs' Second Cross-Motion at 18-19
     (docket no. 51).

ORDER  - 21

bargain, and the Court GRANTS defendants' motion for summary judgment as to plaintiffs' fourth cause of action and DISMISSES with prejudice plaintiffs' claim for unjust enrichment or quantum meruit.

**Conclusion**

For the foregoing reasons, the Court ORDERS:

(1)     Defendants' motion for partial summary judgment as to Craig Wireless's lack of standing, docket no. 44, is GRANTED; Craig Wireless's claim for breach of the Lease Agreement is DISMISSED with prejudice;

(2)     Defendants' motion for partial summary judgment regarding damages, docket no. 43, is GRANTED in part; plaintiffs' remedy for any breach of the Lease Agreement is limited to the retraction of Clearwire Legacy's shares in CW-Manitoba, which has already been exercised; to the extent defendants seek to otherwise limit plaintiffs' damages, their motion is STRICKEN as moot;

(3)     Defendants' motion for summary judgment on the merits, docket no. 42, is GRANTED in part; plaintiffs' second cause of action for breach of the Stock Purchase Agreement[15] and fourth cause of action for unjust enrichment or quantum meruit are DISMISSED with prejudice; to the extent defendants' motion is premised on anticipatory repudiation as a defense, their motion is STRICKEN as moot; defendants' motion on the merits is otherwise DENIED;

(4)     Plaintiffs' cross-motion for summary judgment concerning damages and standing, docket no. 51, is GRANTED in part; CW-Manitoba was entitled to retract Clearwire Legacy's shares upon a request for Equipment in the manner set forth in the Lease

---

[15] Defendants' motion originally rested on the theory that Clearwire Legacy's performance was excused by plaintiffs' inferred anticipatory repudiation.  Defendants' motion transformed after plaintiffs, in their cross-motion on damages and standing, identified sections of the Stock Purchase Agreement that they believe were violated by the alleged breach of the Lease Agreement.  Although the manner of briefing this issue was not traditional, the Court is satisfied that the parties had notice and a full opportunity to be heard, and that the issue of whether plaintiffs' claim for breach of the Stock Purchase Agreement has merit was ripe for the Court's consideration.

1   Agreement and non-delivery of such Equipment, and a breach of the Lease Agreement was

2   not a condition precedent to the retraction of Clearwire Legacy's shares; defendants'

3   counterclaims are DISMISSED with prejudice; plaintiffs' cross-motion regarding damages

4   and standing is otherwise DENIED or STRICKEN as moot;

5       (5)   Plaintiffs' cross-motion for summary judgment on the merits, as amended,

6   docket nos. 50 & 58, is STRICKEN as moot;

7       (6)   In light of the Court's rulings concerning the prerequisites to a proper

8   retraction of shares and the limitation on CW-Manitoba's remedy for breach of the Lease

9   Agreement, plaintiffs' first and third causes of action for breach of the Lease Agreement and

10  breach of the duties of good faith and fair dealing are DISMISSED with prejudice as moot;

11  and

12      (7)   The Clerk is DIRECTED to enter judgment consistent with this Order, to send

13  a copy of this Order to all counsel of record, and to CLOSE this case.[16]

14      IT IS SO ORDERED.

15      DATED this 9th day of September, 2011.

16

17

18  _____
    Thomas S. Zilly
    United States District Judge

19

20

21

22

23

24

25

26

---

[16] The parties are discouraged from filing any motions for attorney fees.  The Court does not view any party as prevailing, both sides having asserted claims on which they did not recover.

ORDER  - 23